## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | No. 21-MJ-236 |
| | : | |
| LUKE RUSSELL COFFEE, | : | |
| Defendant. | : | |

### DEFENDANT'S MEMORANDUM IN SUPPORT OF OPPOSITION TO MOTION FOR EMERGENCY STAY AND FOR REVIEW OF RELEASE ORDER

Luke Coffee**,** through counsel, respectfully files this supplement to his OPPOSITION TO MOTION FOR EMERGENCY STAY AND FOR REVIEW OF RELEASE ORDER, subject to conditions as the Court deems appropriate, and, pursuant to 18 U.S.C. §§ 3145(b) and 3142(e), respectfully moves this Court for an order releasing the Stay Order of the Magistrate's Release from Pre-trial Detention and releasing him to the third-party custody of his parents with location monitoring, as well as other conditions set forth herein.

### Procedural History

On February 25, 2021, Luke Coffee (through his attorney) voluntarily turned himself in to agents in the Northern District of Texas based on charges in a complaint filed on February 16, 2021. The complaint charged Luke Coffee with five violations.[1] In a preliminary hearing on March 8, 2021, Magistrate Judge David Horan denied the Government's motion for detention, ruling (1) that the Government failed to prove Luke Coffee was a flight risk by even a preponderance of the evidence[2], and (2) that the Government failed to prove Luke Coffee was a threat to the community by clear and convincing evidence.[3] The court ordered Luke Coffee released on certain conditions,

---

[1] 18 U.S.C. §§ 111(b) (Assault of Federal Law Enforcement Officer with Dangerous Weapon), 231(a)(3) (Interference with Law Enforcement Officer During Civil Disorder), 1512(c)(2) (Obstruction of an Official Proceeding), and 1752(a)(1) and (2) (Unlawful Entry on Restricted Grounds). 40 U.S.C. § 5104(e)(1) (Disorderly Conduct on Capitol Grounds).

[2] Transcript of March 8, 2021 Detention Hearing, Page 168-170.

[3] Transcript of March 8, 2021 Detention Hearing, Page 169.

including third-party custodianship by his father, supervision by pre-trial services, and electronic monitoring. The Court then stayed that order pending appeal by the Government.

Luke Coffee is incarcerated in the Limestone County Detention Center, Limestone, Texas where he has been detained since his arrest on February 25, 2021. Even if their comments indicate some willingness to engage in future protests or disruption, the Bail Reform Act permits detention only to prevent an "identified and articulable threat to an individual or the community." United States v. Salerno, 481 U.S. 739, 751 (1987). The relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community." United States v. Vasquez-Benitez, 919 F.3d 546, 550 (D.C. Cir. 2019). In assessing public safety and flight risk, four factors are to be considered: (1) the nature and circumstances of the offense charged, (2) the weight of the evidence against the person, (3) the history and characteristics of the person, (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g). For the public-safety determination, the Government must prove all relevant facts "by clear and convincing evidence," 18 U.S.C. § 3142(f)(2).

**Factual Background**

**A. Luke Coffee acted as a peacemaker by urging Capitol rioters to "Stop" and "Pray."**

On January 6, 2021, Luke Coffee, a deeply religious man, attended what he understood to be a rally in Washington, D.C. by President Donald Trump. Following the President's speech at the conclusion of the rally, he lingered and documented the day by filming other attendees around the area of the Ellipse/National Mall. After filming, he made his way to the Capitol Building.

During the March 8, 2021 hearing, the defense played a clip of the discovery video from Social Media [1 hour, 14 minutes, 16 seconds mark to 40 seconds mark] which the prosecution had previously not shown. After Jim Burnham showed the clip from the discovery video, he and Special Agent Hillman had the following exchange:

<u>Luke Coffee says "Stop" and "Pray":</u>

     **Burnham:**  Okay. We're going to play it again. Now, Officer, did Luke Coffee in that video yell to the crowd, Stop, stop, stop, stop, four times?

     **Hillman:**   Yes, sir, that's what it sounded like he was saying.

     **Burnham:**  Okay. Did he say, Pray -- stop -- pray, pray, pray, pray, pray, pray, pray, pray, pray –nine times?

     **Hillman:**  I don't know how many times it was, <u>but it was multiple times is what it sounded like, yes, sir.</u>

Special Agent Hillman also testified that Luke Coffee was attempting to act as a peacemaker between Capitol rioters and Capitol Police during this time. Special Agent Hillman also testified that when he spoke to Luke Coffee on January 13, 2021, he told Luke Coffee that it looked like he was "trying to help stop it all."[4]

<u>Special Agent Hillman told Luke Coffee on January 13, 2021, "It looks like you were trying to stop it all":</u>

     **Burnham:**  Okay. So he was out there trying to make peace, be a peacemaker and trying to stop everybody, wasn't he?

     **Hillman:**  In that part of the video, yes, sir.

     **Burnham:**  <u>Remember when you talked to him on the 13th, you said, It looks like you were trying to stop it all out there?</u>

     **Hillman:**  <u>Yes, sir.</u>[4]

Luke Coffee's pleas to the Capitol rioters to "stop" and "pray" are also clear from several still frames captured from the discovery videos and the Statement of Facts for the criminal complaint. In Figure 1 below (identified as "Figure 4" in the Statement of Facts) Luke Coffee can



---

[4] Transcript of March 8, 2021 Detention Hearing, Page 82. Lines 4-19.
[4] Transcript of March 8, 2021 Detention Hearing, Page 82. Lines 4-19.

be seen turning around, his hat in his hand as he prays, and begs the Capitol rioters to stop, at approximately 4:25pm.

Further images captured from Social Media video provided in discovery and offered as Exhibit 2 by the defense during the hearing on March 8, 2021 show Luke Coffee continuing to plead with the Capitol rioters to stop. Figures 2, 3, and 4, below show Luke Coffee with his hands in the air, facing the Capitol rioters, and begging them to stop (This is audible), at approximately 4:25pm.


*Figure 2*


*Figure 3*


*Figure 4*

**B. Luke Coffee did not bring the crutch from Dallas. Luke Coffee picked up the crutch after he was pepper sprayed attempting to separate Capitol rioters from the Capitol Police.**

**4:28pm.** As Luke Coffee attempted to stop the violent confrontations between the Capitol rioters and the Capitol Police officers, he climbed the steps towards the tunnel. There, he used his hand to motion for the Capitol Police officers to stop and per the discovery video from the Capitol security camera, you can clearly read his lips as he says stop multiple times. This is visible from multiple angles in Figure 5 (labelled Figure 1 in the Statement of Facts) and Figure 6 (see images below). When he spoke with Special Agent Hillman, Luke Coffee stated that he was yelling, "In the name of Jesus, stop!" as he held the crutch over his head in peace. Special Agent Hillman also

testified that Luke Coffee appears to be trying to stop the Capitol rioters in this video. Special Agent

Hillman stated that Luke Coffee told him he was only trying "to separate the two groups."[5]

**Burnham:** Well, you told him he wasn't a suspect. <u>And you further said, it looks like you were trying to help stop it all. Do you remember telling him that</u>?

**Hillman:** <u>Yes, sir</u>.

**Burnham:** So were you telling him the truth when you said that or were you lying to him?

**Hillman:** I was telling him the truth based on what I had seen at

**Burnham:** So you weren't trying to trick him or --

**Hillman:** No, sir.

**Burnham:** Okay. And then he told you, he said, "Coffee looked down and saw a crutch" -- first of all, you said in your 302, "Coffee was able to get between the crowd and the police the police were hitting the crowd and the crowd were hitting the police. <u>Coffee looked down and saw a crutch sitting on the ground. He grabbed the crutch and held it over his head and yelled, 'In the name of Jesus stop.'" Did he tell you that</u>?

**Hillman:** <u>Yes, sir</u>.

**Burnham:** <u>Does that look like he was trying to stop the so-called protesters</u>?

**Hillman:** <u>Yes, sir</u>.

**Burnham:** <u>Did he indicate to you that he was not trying to hit the police or the crowd with the crutch</u>?

**Hillman:** <u>He did</u>.

**Burnham:** He only used it to separate the two groups. Isn't that what he told you?

**Hillman:** Yes, sir.[6]



*Figure 5*



*Figure 6*



*Figure 7*

---

[5] Transcript of March 8, 2021 Detention Hearing, Page 53. Lines 8-14 and 18-20.

[6] Transcript of March 8, 2021 Detention Hearing, Page 53. Page 52 Lines 18-25 and Page 53 Lines 1-20

Unfortunately, the Capitol Police officers misinterpreted Luke Coffee's actions and began to pepper spray his face repeatedly, as can be seen in Figure 7. Luke Coffee bent down, picked up a crutch and held it above his head as a symbol of peace. He bowed his head to avoid the continued pepper spraying. He appears to continue to beg the officers to stop. This sequence of events is visible in Figures 8, 9, and 10.


*Figure 8*


*Figure 9*


*Figure 10*

**4:28pm:** After several more seconds of being pepper sprayed, a confused, blinded, and disoriented Luke Coffee bent down and held the crutch out in front of himself at waist height for protection. Special Agent Hillman testified that the crutch only made contact with the apparent line Capitol Police officers for "probably less than 10 seconds" and that it "could…be less than 5 seconds."[7]

> **Burnham:** …the most he could have made any alleged physical contact was three to five seconds. Is that a fair statement?
> **Hillman:** Based on the YouTube video?
> **Burnham:** Yes, sir.
> **Hillman:** Probably less than 10 seconds.
> **Burnham:** Less than 10 seconds.
> **Hillman:** Yes, sir
> **Burnham:** Okay. And could it be less than five seconds?
> **Hillman:** I guess it could be. I didn't -- wasn't timing his contact.
> **Burnham:** Well, that's important, you know, if I'm -- but anyhow, less than five seconds. And the body cam video, less than 10 seconds. Right?
> **Hillman:** The physical contact, yes, sir.

---

[7] Transcript of March 8, 2021 Detention Hearing, Page 90. Lines 13-22

Luke Coffee was trying to keep the two groups apart. He was trying to keep the peace by continuously saying "Stop!" and "Pray!" During approximately 4:25pm & 4:26pm, Luke Coffee shouted "Stop!" and "Pray!" toward the large crowd of Capitol rioters and prayed with them. At 4:28pm, Luke Coffee approached and shouted to the Capitol Police to "Stop!"

Luke Coffee was standing near the entrance of the Tunnel Archway and the Capitol Police were stationed in the Tunnel Archway. Luke Coffee was about 4 feet (or 2 steps) from the Capitol Police. Two Capitol Policemen in the second row (see photos 7 & 8) started pepper spraying Luke Coffee at approximately 4:27:50 and it continued until 4:28:17. It is a reasonable deduction from the evidence that Luke Coffee was disoriented after being pepper sprayed. Luke Coffee was hit with batons, pepper sprayed, and fell to the ground.

The evidence from the bodycam in Figure 11 below (Figure 18 in the Statement of Facts) clearly shows that the Luke Coffee was on the ground at 4:28.48 and it is a reasonable deduction that he was disoriented.



*Figure 11 (Figure 18 in the Statement of Facts)*

The evidence from the bodycam in Figures 12 and 13 below (Figures 19 and 20 in Statement of Facts) clearly shows Luke Coffee trying to stand up with the crutch held horizontally with both hands at waist level and that as he began moving forward with the crutch, he still held the crutch horizontally with both hands at waist level.  Per the bodycam time stamp, Figures 12 and 13 were both taken at exactly the same time, 4:28:51.

 

*Figure 12 (Figure 19 in the Statement of Facts)*     *Figure 13 (Figure 20 in the Statement of Facts)*

The evidence from the bodycam in the Figure 14 below (Figure 21 in the Statement of Facts) clearly shows that Luke Coffee was pressing against the first row of the Capitol Police line with the crutch held horizontally with both hands at waist level.



*Figure 14 (Figure 21 in the Statement of Facts)*

The evidence shows that the above alleged contact lasted approximately 5 seconds and the crutch was not used as a dangerous weapon.

**The evidence shows that entire contact between Luke Coffee and the Capitol Police was approximately 25 seconds.**

Luke Coffee's primary activities on January 6, 2021 were filming and praying. Luke Coffee did not enter the Capitol.  Luke Coffee did not vandalize any property or physically harmed any person.  Luke Coffee did not organize the election protest or the ensuing march to the Capitol.  Luke Coffee hatched no advance plan to enter the Capitol. Luke Coffee did not remove any barricades in order to breach the Capitol security.

**C.  Luke Coffee was not part of any organization intending to foment insurrection.**

Luke Coffee's attorney understands that there were certain organizations (such as Proud Boys, VSC-131, the Three Percenters, and others) with members present on January 6, 2021, whose efforts indicated a coordinated and premeditated plan of action. Luke Coffee did not attend this rally as a member of any such organization, and the Government has not alleged that Luke Coffee was a member of any such organization.

**D.  Luke Coffee fully cooperated with authorities at every stage of this investigation.**

Special Agent Michael Hillman contacted Luke Coffee for the first time on January 13, 2021, leaving him a voicemail and text message. Luke Coffee voluntarily returned Special Agent Hillman's call that same day and openly discussed the events of January 6, 2021. Special Agent Hillman testified that Luke Coffee "called me right after I texted him." Special Agent Hillman also told Luke Coffee at that time that he was not a suspect.[8]

---

[8] Transcript of March 8, 2021 Detention Hearing, Page 52 Lines 4-12

**Hillman:**   Mr. Coffee called me after I texted him.
**Burnham:**  Okay. So you texted him. Right?
**Hillman:**   Correct.
**Burnham:** All right. And did he call you back?
**Hillman:**   He did.
**Burnham:** Would you say that's cooperative?
**Hillman:**   Yes, sir.
**Burnham:** And did you tell him at that time he wasn't a suspect?
**Hillman:**  Yes, sir.

Special Agent Hillman testified that Luke Coffee "did clarify why his apartment number was different on his driver's license than where he actually lived," and admitted that Luke Coffee was "cooperative and helpful." Special Agent Hillman stated that Luke Coffee, "did not appear to be trying to hide where he lived." [9]

**Burnham:** Did he tell you where he lived at the time, sir?
**Hillman:** He didn't give me his street address, but he did clarify why his apartment
            number was different on his driver's license than where he actually lived.
**Burnham:** So he was cooperative and helpful?
**Hillman:**  Yes, sir.
**Burnham:** He wasn't trying to flee then, was he?
**Hillman:**   He did not appear to be trying to hide where he lived.
**Burnham:** Okay. And he consented to be interviewed.
**Hillman:**   Yes, sir.
**Hillman:**   He did not appear to be trying to hide where he lived.
**Burnham:** Okay. And he consented to be interviewed.
**Hillman:**   Yes, sir.
**Burnham:**  And he said he was at some place where social media can keep away from
             him, get out of the social media. Is that correct?
**Hillman:**    It was social media or the media or his friends or family, or all of those, yes, sir.

According to Special Agent Hillman, Luke Coffee told Special Agent Hillman that he believed the rally would be a peaceful event, and that he went to try to hear Billy Graham's son speak.[10]

**Burnham:** And did he say when he went to Washington he had no intention of violence at
            the rally and -- did he tell you that?
**Hillman:**  Yes, sir.
**Burnham:** And he believed the rally would be a peaceful demonstration.
**Hillman:**  Yes, sir.
**Burnham:** Did he tell you he heard that Billy Graham's son was going to speak and he

---

[9] Transcript of March 8, 2021 Detention Hearing, Page 54. Lines 22-25 and Page 55 Lines 1-11
[10] Transcript of March 8, 2021 Detention Hearing, Page 56 Lines 9-17

> was going to try to hear him?
>
> **Hillman:**   Yes, sir.

Special Agent Hillman further testified that Luke Coffee was attempting to be a peace maker and

stop the Capitol rioters.[11]

> **Burnham:** Did he say he moved up the steps to get between the police and hostile crowd
> to stop the violence?
>
> **Hillman:**   Yes, sir.

Special Agent Hillman testified that over the next two weeks, Luke Coffee voluntarily

communicated with Special Agent Hillman "at least another dozen times" before Luke Coffee's

attorney contacted Special Agent Hillman per Hillman's request.[12]

> **Hillman:**   He texted me back several times, and he said, "At this
> point I think I need to get a lawyer." He said, "I would need my attorney to be
> present at this point." And then he texted at least another dozen times, maybe
> more. And I responded, "Have your attorney call me, please."
>
> **Burnham:** Okay. So he was being cooperative, wasn't he?
>
> **Hillman:**   Yes, sir.

On February 2, 2021 Luke Coffee's attorney, Jim Burnham, immediately reached out to

Special Agent Hillman on behalf of Luke Coffee "Mr. Coffee obtained a lawyer and his lawyer

contacted me."[13] and when asked if Luke Coffee was cooperating, he said "Yes, Sir."[14] Special

Agent Hillman testified that Jim Burnham spoke with him at least 7 times in February 2021 and

every time Jim Burnham talked to him, he said that Luke Coffee would turn himself in.[15] Below

is a list of calls between Special Agent Hillman and Jim Burnham:

February 2, 2021
- Special Agent Hillman testified that on February 2, 2021 he spoke to Jim Burnham and told
  him that he believed the offense was Federal misdemeanor.[16]

---

[11] Transcript of March 8, 2021 Detention Hearing, Page 57 Lines 23-25
[12] Transcript of March 8, 2021 Detention Hearing, Page 64 Lines 19-23
[13] Transcript of March 8, 2021 Detention Hearing, Page 66 Line 14
[14] Transcript of March 8, 2021 Detention Hearing, Page 66 Line 16
[15] Transcript of March 8, 2021 Detention Hearing, Page 69 Lines 18-20
[16] Transcript of March 8, 2021 Detention Hearing, Page 67 Line 5

**Burnham:** Do you remember telling me you thought this was a federal misdemeanor?
**Hillman:**  What date was that?
**Burnham:** February the 2nd.
**Hillman:**  On February the 2nd I did believe this was a misdemeanor.

February 3, 2021

- Special Agent Hillman testified that Jim Burnham spoke to him on February 3, 2021 and he told Jim Burnham that a charge decision had not been made.[17]

    **Burnham:** …Now we go to February 3rd, the next day. I'm making notes, sir, and
                 assume you might want to assume I'm recording it, too. Okay?
    **Hillman:**  Okay.
    **Burnham:** I called you on the very next day and you told me a charge decision had not
                 been made. Is that correct?
    **Hillman:**  That's correct.

February 9, 2021

- Special Agent Hillman testified that Jim Burnham spoke to him on February 9, 2021 and that he told Jim Burnham that he had <u>not seen any violent posts by Luke Coffee</u>.[18]

    **Burnham:** Then <u>on February the 9th</u> I called you and <u>you told me that you had not seen
                 any violent posts by Coffee.</u> Did you tell me that?
    **Hillman:**  <u>Yes, sir.</u> I don't know of the date, but if you say that that was the date, then
                 that sounds like.
    **Burnham:** Okay.
    **Hillman:**  I remember having that conversation with you.

February 24, 2021 approximately @9:15 AM

- Special Agent Hillman testified that he spoke with Jim Burnham again on February 24, 2021 when he asked if Luke Coffee's number changed.[19]

    **Burnham:** Okay. And then on February 24th -- and I was in court in Collin County, and
                 you called me and I called you back immediately, didn't I? Or pretty quick,
                 didn't I?
    **Hillman:**  You always returned my calls promptly.
    **Burnham:** Okay. Thank you. And you said, I'm worried your client is going to flee; he
                 changed his phone number, didn't you?
    **Hillman:**  I did ask you if your client changed his phone number.

February 24, 2021 @12:30 PM

- Special Agent Hillman testified that he spoke with Jim Burnham on February 24, 2021 at 12:30 PM and Jim Burnham informed him that Luke Coffee's cell phone number had not changed.[20]

---

[17] Transcript of March 8, 2021 Detention Hearing, Page 68 Lines 7-9
[18] Transcript of March 8, 2021 Detention Hearing, Page 68 Lines 17-23
[19] Transcript of March 8, 2021 Detention Hearing, Page 68 Lines 24-25 Page 69 Lines 1-6
[20] Transcript of March 8, 2021 Detention Hearing, Page 69 Lines 7-14

**Burnham:** …I called you back at 12:30 after I got back from the courthouse and I explained to you that he has the same cell phone number, but if you're calling from a land line, you got the dial 1, but if you're dialing just the cell phone you don't have to dial 1.

**Hillman:** That's correct.

February 24, 2021 @3:30 PM

- Special Agent Hillman testified that he spoke with Jim Burnham on February 24, 2021 at 3:30 PM and that Jim Burnham notified him Luke Coffee's was moving to Tool, Texas, to stay with his parents.[21]

**Burnham:** Then at 3:30 I called you alone and I informed you that Luke Coffee was moving from his Dallas address on 113 Main Street to 11 -- no, I guess I got that Main Street address wrong. But that he was going to move to 113 Rim of the World, Tool, Texas, and stay at a home where his parents have a lake house, and he was going to stay in another house on their property.

**Hillman:** You didn't give me the address. You said you could give me the address. But the address in Tool, Texas, is not correct. That's the wrong address, and the address on Main Street is incorrect also. But the gist of the conversation between us was -- is that Mr. Coffee was vacating his apartment and was going to move into his parents' lake house in Tool, Texas.

February 24, 2021 @5:00 PM

- Special Agent Hillman testified that he spoke with Jim Burnham on February 24, 2021 at 5:00 PM and that he told Jim Burnham that Luke Coffee needed to turn himself in the next day, Friday, February 25th at 9:00 AM at the Federal Court House.[22]

**Burnham:** And then at 5:00 when I was getting ready to leave the office and meet my wife, who was going out of town to visit my granddaughter, you called and told me that Luke Coffee needed to turn himself in the next day, Friday, at 9:00 a.m., didn't you?

**Hillman:** That's correct.

**E. Luke Coffee voluntarily turned himself in and gave consent to search his car.**

Luke Coffee voluntarily turned himself in on February 25, 2021, at 9:00 am as scheduled.[23]

**Burnham:** Okay. So he voluntarily surrendered.

**Hillman:** That's correct.

---

[21] Transcript of March 8, 2021 Detention Hearing, Page 70 Lines 8-21
[22] Transcript of March 8, 2021 Detention Hearing, Page 71 Lines 8-13
[23] Transcript of March 8, 2021 Detention Hearing, Page 71 Lines 14-19

Special Agent Hillman further testified that Luke Coffee voluntarily gave him consent to search his vehicle to save him the trouble of going to a Judge and getting a search warrant. Luke Coffee also voluntarily told Special Agent Hillman where his car keys and backpack were.[24]

**Hillman:** In an effort not to damage Mr. Coffee's car, he told us that the keys to his car were on the back wheel of his vehicle because his parents were going to come and pick it up.
**Burnham:** He told you where the keys to his car was?
**Hillman:** Yes, sir.
**Burnham:** Was it there?
**Hillman:** Yes, sir.
**Burnham:** And you got -- and he told you where his cell phone was?
**Hillman:** Yes, sir.
**Burnham:** In the console of the car. Did he tell you the backpack was in the car?
**Hillman:** Yes, sir.

## F. Special Agent Hillman did not consider Luke Coffee a flight risk on February 25, 2021, the day after he turned himself in.

Special Agent Hillman testified at the detention hearing that he remembered telling Luke Coffee's attorney that Luke Coffee was not considered a flight risk "so far" when they spoke by phone on February 25, 2021, the day after Luke Coffee turned himself in voluntarily. [25]

**Burnham:** And then I called you the next day the 25th and I said, you don't think you're <u>not trying to say Luke Coffee's a flight risk</u>, <u>and you say</u>, <u>So far no</u>. Remember saying that to me?
**Hillman:** <u>Yes, sir</u>.

## G. Luke Coffee's response to the Government memorandum section I. (A) and I. (C).

Luke Coffee's response to Government Memorandum I. (A). The Government is misconstruing the statements in the Conspiracy Castle Video from January 5, 2021 with actor and producer Luke Coffee. The "nature and seriousness" of Coffee statements in the interview are bravado, exaggerated, and for entertainment.

---

[24] Transcript of March 8, 2021 Detention Hearing, Page 72 Lines 20-25 and Page 73 Lines 1-14
[25] Transcript of March 8, 2021 Detention Hearing, Page 73-74 Lines 24-25 and Lines 1-3

On January 15 and January 17, 2021, Luke Coffee appeared on a YouTube show titled "Conspiracy Castle." During this interview, he made statements that the Government has misconstrued. It should be noted that the intent of "Conspiracy Castle," as stated in the video admitted as Exhibit 7, is for "entertainment purposes only." On the January 15, 2021 video, Luke Coffee makes multiple references to helping the host "be famous." Luke Coffee's comments on the video should be construed in this light as entertaining embellishments intended for the host's target audience.

In response to the Governments section C. "Coffee's Conduct Following the January 6, 2021 Attack," primarily deals with the Conspiracy Castle entertainment videos on YouTube on January 15, 2021 and January 17, 2021.

The Government calls attention to the statements of Luke Coffee's, January 15, 2021 and January 17, 2021 interview on the "Conspiracy Castle" YouTube channel. The "nature and seriousness" of Coffee statements in the interview are bravado, exaggerated and for entertainment.

Before these two Conspiracy Castle interviews, Luke Coffee communicated with Special Agent Mike Hillman on January 13, 2021. Special Agent Hillman testified that Luke Coffee "called me right after I texted him." Special Agent Hillman also told Luke Coffee at that time that he was not a suspect and told Luke Coffee that it looked like Luke was trying to stop it all.

The Government also misconstrued a portion of a text conversation between Luke Coffee and his family member to indicate a willingness to hide from and resist the authorities. In this excerpt, Luke Coffee's response to his family member's questions regarding arming himself and having been in contact with the federal authorities is "Yap to both." Luke Coffee made no admissions by saying "Yap." The Government misconstrues "Yap" to be an alternative spelling for "Yes," meaning that Luke Coffee confirms his intent to arm himself and the fact that he has spoken

to federal agents. This flies against the plain meaning of the word "Yap," which is defined as "a shrill barking noise, or (informal) to talk at length in an irritating manner." Luke Coffee and his family member had a lengthy text conversation which he was not eager to continue. In telling his family member "Yap," Luke Coffee expressed his frustration that his family member continued to talk at such length about this subject. According to the plain language of the word "Yap," Luke Coffee's command "Yap to both," could best be read as "Please stop talking about both topics."

Regardless of such semantic leaps as the Government's assertion that "Yap" means "Yes," the intent of Luke Coffee in the days after January 6, 2021, was clear. He intended to cooperate with authorities. This is clear from his actions during this time. Luke Coffee was in frequent, voluntary communication with Special Agent Hillman, he hired an attorney, he turned himself in, and he gave the Government consent to search his vehicle.

Luke Coffee does not own a firearm, and he has made no actions toward obtaining any firearm. The Magistrate Court summarized Luke Coffee's actions and intent thus: "There is no evidence that Mr. Coffee has, in fact, obtained a firearm or attempted to do so or has any real or specific plans to engage in any further confrontations with law enforcement…in actuality, Mr. Coffee hired a lawyer and turned himself in and gave consent to search his vehicle."[26]

### Legal Standard

The Supreme Court has made it clear that "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." United States. v. Salerno, 481 U.S. 739, 755 (1987). That is why "[t]here can be no doubt that this Act clearly favors nondetention." United States. v. Byrd, 969 F.2d 106, 109 (5th Cir. 1992) (emphasis added).

---

[26] Transcript of March 8, 2021 Detention Hearing, Page 169

18 U.S.C. § 3142(b) provides that "The judicial officer shall order the pretrial release of the [defendant]…unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community."

The Government must establish that no conditions of release will reasonably assure the appearance of the defendant at trial by a preponderance of the evidence. See United States v. Tedder, 903 F. Supp. 344, 345 (N.D.N.Y. 1995) (citing United States v. Martir, 782 F.2d 1141, 1146 (2d Cir. 1986). The Government must establish that no conditions of release will reasonably assure the safety of the community by clear and convincing evidence. Rodriguez, 897 F. Supp. at 1463 (citing United States v. Orta, 760 F.2d 887 (8th Cir. 1985).

The Court's four considerations when weighing such conditions of release are provided under §3142(g): (1) the nature and circumstances of the offense; (2) the weight of the evidence against that person; (3) the history and characteristics of that person; and (4) the nature and seriousness of the danger to any person or the community.

## Argument

**A.**  **Appropriate conditions of release exist to reasonably assure that Luke Coffee will appear as required and will not pose a threat to the safety of any person or the community.**

After reviewing the evidence in this case, the Magistrate Court stated: "The Court does believe that there are conditions that can be set to reasonably assure Mr. Coffee's appearance as required and the safety of any other person or the community if released."[27] In addition to the usual

---

[27] Transcript of March 8, 2021 Detention Hearing, Page 169-170

conditions of release, the Magistrate Court ordered the appropriate conditions of release discussed below.

### a. Luke Coffee's father is an appropriate third-party custodian.

The defense proposes that Luke Coffee be released to the third-party custody of his father, Russell Coffee, Sr. Thus, release to the custodianship of Luke Coffee's father is, in essence, an extra assurance of compliance with release conditions.

### b. Luke Coffee's prohibition from owning a firearm will minimize his already minimal threat to the safety of any person or the community.

Luke Coffee does not own a firearm, and the Magistrate Court found that "there is no evidence that Mr. Coffee has, in fact, obtained a firearm or attempted to do so or has any real or specific plans to engage in any further confrontations with law enforcement." Under the conditions of release ordered by the Magistrate Court, Luke Coffee would not be allowed to obtain or possess a firearm. This condition minimizes any risk that Luke Coffee could pose a danger to any person or to the community.

### c. Electronic monitoring will further minimize Luke Coffee's already minimal flight risk.

In addition to third-person custodianship by Luke Coffee's father, the Magistrate court ordered that Luke Coffee "be subject to stand-alone monitoring" in the form of a "GPS system tracking to monitor and enforce his position."[28] This condition minimizes any risk that Luke Coffee could fail to appear for court as required.

Taken together, these conditions, in addition to the other conditions ordered by the Magistrate court, provide a reasonable assurance that Luke Coffee will appear as required and will not pose a threat to the safety of any person or the community.

---

[28] Transcript of March 8, 2021 Detention Hearing, Page 174 Line 4

**B.**      **The factors to be considered under 18 U.S.C. §3142(g) weigh in favor of release.**

The relevant inquiry is whether Luke Coffee is a 'flight risk' or a 'danger to the community.'

United States v. Vasquez-Benitez, 919 F.3d 546, 550 (D.C. Cir. 2019). The 4 statutory factors to

be considered are as follows:

    **a.   Nature and Circumstances of the Offense Charged**

The first factor, to be considered, the "nature" and "circumstances" of the "charged" offense

looks to favor the release of Luke Coffee from detention.  The "nature" refers to the generic offense

while the "circumstances" encompasses the manner in which the defendant committed it." United

States v. Singleton, 182 F.3d 7, 12 (D.C. Cir. 1999).

With respect to the circumstances of the offense charged, as shown in the Factual

Background above, Luke Coffee's actions were those of a peacemaker. As Capitol rioters clashed

with Capitol Police, he attempted to get between them and separate the two sides. As testified to by

Special Agent Hillman, he shouted at the Capitol rioters and the Capitol Police to "stop" and pray"

multiple times. Finally, while being repeatedly pepper sprayed, he picked up a crutch, held it above

his head, and then held it out in front of him, and says stop (you can clearly read Luke Coffee's

lips saying stop multiple times in the discovery video entitled: *COFFEE-*

*0074USCHBALowerWTerraceDoorExterior_2021-01-06_16h15min38s597ms*. 12 Minutes and 27

second mark to the 12 minute and 40 second mark).

It is a reasonable deduction from the evidence that the effect of the hit on the head and the

police-strength pepper spray caused disorientation. Figure 11 (Statement of Facts Figure 18) is

time stamped at 4:28.48 clearly show Luke Coffee on the ground disoriented from the hits by the

batons and the pepper spray. Figure 12 (Statement of Facts Figure 19) is time stamped at 4:28:51

showing Luke Coffee trying to stand up with the crutch held horizontally with both hands at waist

level. Figure 13 (Statement of Facts Figure 20) is time stamped at 4:28:51 showing Luke Coffee

moving forward with the crutch held horizontally with both hands at waist level. Figure 14 (Statement of Facts Figure 21) is time stamped at 4:28:52 shows Luke Coffee pressing against the first row of the Capitol Police line with the crutch held horizontally with both hands at waist level. Special Agent Jeffrey Johannes states that, "The video also shows Coffee holding the crutch in a more aggressive manner and position towards the Capitol Police officers. It appears to your affiant, based on this footage, that Coffee intended to further use the crutch as blunt object weapon by positioning the crutch directly toward the officer's upper chest/head area."[29] Per Figures 12, 13, and 14 (Figures 19, 20, and 21 of the Statement of Facts), this second alleged contact between Luke Coffee and the Capitol Police happened from 4:28:51 to 4:28:56 and for 2 of those 5 seconds Luke Coffee was not in contact with the officers, meaning he only made contact for 3 seconds.

Based on this conduct, the Government has charged Luke Coffee under 18 U.S.C. §111(b), Assault of Federal Law Enforcement Officer with Dangerous Weapon. There are several reasons that this charge is erroneous.

**b. Luke Coffee never used the crutch as a "dangerous weapon." 18 U.S.C. §111 (b)**

A dangerous weapon is defined as "Any object, such as a gun, knife, sword, crossbow, or slingshot, that is intrinsically capable of causing serious bodily harm to another person." From the evidence, Luke Coffee's intent was not to injure anyone (much less seriously injure anyone). The crutch was not swung violently or stabbed at the officers. The Statement of Facts, the basis of the Complaint, states on page 12 that, "I observed on the same video sources, at approximately 4:28pm, Coffee lowered the crutch approximately chest high and then lowered it to waist high and proceed to push the crutch into the line of MPD and USCP officers." This is the first contact with the officers

---

by Luke Coffee as sworn to in the Statement of Facts by Special Agent Jeffrey Johannes on February 16, 2021.

Furthermore, Special Agent Hillman testified that any physical contact between the crutch and officers was probably less than ten seconds.[30]

> **Burnham:** …the most he could have made any alleged physical contact was three to five seconds. Is that a fair statement?
> **Hillman:**  Based on the YouTube video?
> **Burnham:** Yes, sir.
> **Hillman:**  Probably less than 10 seconds.
> **Burnham:** Less than 10 seconds.
> **Hillman:**  Yes, sir
> **Burnham:** Okay. And could it be less than five seconds?
> **Hillman:**  I guess it could be. I didn't -- wasn't timing contact.
> **Burnham:** Well, that's important, you know, if I'm -- but anyhow, less than five seconds. And the body cam video, less than 10 seconds. Right?
> **Hillman:**  The physical contact, yes, sir.

Based on the evidence, Luke Coffee did not commit an offense under USC 18 111(b) when he "…lowered the crutch approximately chest high and then lowered it to waist high and proceed to push the crutch into the line of MPD and USCP officers." as stated by Special Agent Jefferey Johannes in the Statement of Facts sworn to on February 16, 2021. In other words, Luke Coffee did not use the crutch as a dangerous weapon.

In the Statement of Facts on page 16 Special Agent Jeffrey Johannes states that, "The video also shows Coffee holding the crutch in a more aggressive manner and position towards the Capitol Police officers. It appears to your affiant, based on this footage, that Coffee intended to further use the crutch as blunt object weapon by positioning the crutch directly toward the officer's upper chest/head area." Per Figures 12, 13, and 14 (Figures 19, 20, and 21 of the Statement of Facts), this second alleged contact lasted from 4:28:51 to 4:28:56 and for 2 of those

---

[30] Transcript of March 8, 2021 Detention Hearing, Page 90. Lines 13-22

5 seconds Luke Coffee was not in contact with the officers, meaning he only made contact for 3 seconds. When Luke Coffee was in contact with the officers for the 3 seconds, the evidence shows that Luke Coffee did not use the crutch as a dangerous weapon. The crutch is not a dangerous weapon within the meaning of the statute.

Holding a crutch in both hands at waist height causing contact lasting 25 seconds or less does not constitute using a dangerous weapon.

**c. Luke Coffee did not inflict bodily injury.**

There is no evidence to indicate that Luke Coffee inflicted bodily injury on any officer.[31]

> **Burnham:** Okay. And I asked you, was anybody injured in the bodycam; is anybody, any officer or injured, and you said, Nobody's injured. Do you remember that?
>
> **Hillman:** No, sir. I said that I don't know if anyone's injured, to the best of my knowledge they are not.

**d. Weight of the Evidence**

The second factor to be considered, the weight of the evidence, also clearly weighs in favor of release from detention. The weight of the evidence against Luke Coffee must be clear and convincing evidence, considered in the context, that Luke Coffee presents an identified and articulable threat to an individual or the community in view of his conduct on January 6, 2021, and the particular circumstances of January 6, 2021 and poses an unmitigable future threat to public safety and presents a demonstrable danger to the community. The Government has not presented clear and convincing evidence of an identified and articulable future threat by Luke Coffee to an individual or the community shown in the context of Luke Coffee's conduct on January 6, 2021, and the particular circumstances of January 6, 2021. The Government has not presented clear and convincing evidence that Luke Coffee poses an unmitigable future threat to

---

[31] Transcript of March 8, 2021 Detention Hearing, Page 74 Lines 4-9

public safety and presents a demonstrable danger to the community. The threat must also be considered in context. See Tortora, 922 F.2d at 888 Detention determinations must be made individually and, in the final analysis, must be based on the evidence which is before the court regarding the particular defendant.

The only testimonies provided so far are from Special Agent Jeffrey Johannes on February 16, 2021 and Special Agent Michael Hillman on March 8, 2021. The two Special Agents have reviewed various videos of the alleged assault. These videos are from various angles and of various qualities, but they all share one thing in common – it is extremely difficult to determine what exactly is happening during the 13 seconds of the alleged assault.

### e. History and Characteristics of Luke Coffee

The third factor to consider, the history and characteristics of Luke Coffee, clearly favors the release from detention. Luke Coffee's history and characteristics do not support detention. Luke Coffee voluntarily surrendered to the FBI. Before his arrest warrant had even issued, Luke Coffee established contact with the FBI so that he could turn himself in as soon as requested.

Luke Coffee is a loving son, brother, and friend with significant ties to the community, "…defendant stated he has daily contact with both of his parents who reside in Tool, Texas. The defendant reported bi-weekly contact with his brothers, Ben Coffee and Nate Coffee, who both reside in Dallas, Texas. The defendant related he has weekly contact with his sister, Helen Coffee, who resides in Marble Falls, Texas…The defendant's personal history and familial ties were verified by the defendant's mother, Marybeth Coffee, via telephone."[32] For the last 13 years, Luke Coffee has been the owner of Coffee Productions Inc. based in Dallas, TX:[33]

---

[32] Pretrial Services Report of March 5, 2021, Page 2
[33] Pretrial Services Report of March 5, 2021, Page 3

**EMPLOYMENT HISTORY / FINANCIAL RESOURCES:**

**Employed/Unemployed History:**

| Start Date | End Date | Employer Name/ Unemployed | Address | Monthly Income | Time in Status/ Hours a Week |
|---|---|---|---|---|---|
| 02/26/2009 | | Coffee Productions Inc. | Dallas, TX | $12,500.00 | 12 years |

The defendant reported he is the owner of Coffee Productions Inc., which he stated he has owned for 12-13 years.

Mrs. Coffee informed the defendant has owned Coffee Productions Inc., for the past 15 years.

Many of Luke Coffee's family and friends came to the detention hearing as character witnesses. Some highlights from their testimony are summarized below. These 6 witnesses and 9 proffered witnesses demonstrate that Luke Coffee is as a loving, non-violent person who poses no flight risk or threat to the community.

### a. Helen Coffee, sister of Luke Coffee

Helen Coffee testified that Luke Coffee has been her constant comfort and support as she has suffered from painful, debilitating Lyme's disease for the past eight years[34]:

> **Burnham:** Okay. And how did Luke treat you when you -- were really a younger sister, eight years younger, and you were kind of seriously ill, how did he treat you?
> **H. Coffee:** He would visit me in the hospital. I had to do infusions that were six hours long. He'd come sit with me, check on me, text me, call me. He was -- it's a very misunderstood disease, and he was very understanding and compassionate, and he was the only one that would really listen to me and really show that he cared. You know, a lot of people just didn't understand it, and he took the time to understand it, get people to help me, look up doctors, so.

When asked if Luke Coffee would ever flee the court's jurisdiction, Helen Coffee answered that he would not.[35]

> **Burnham:** If His Honor here saw fit to give Luke pretrial release, do you think you would -- do you think he would flee from the court, flee the jurisdiction?

---

[34] Transcript of March 8, 2021 Detention Hearing, Page 107 Lines 1-11
[35] Transcript of March 8, 2021 Detention Hearing, Page 108 Line 9

**H. Coffee:** Absolutely not.

When asked if Luke Coffee is a violent person, Helen Coffee answered he was not. [36]

**Burnham:** I mean, and do you think Luke is a threat to anyone in -- or a danger to anyone in the community or any person in the community?
**H. Coffee:** Absolutely not.
**Burnham:** Is Luke a violent person?
**H. Coffee:** Absolutely not. I've never seen him violent.
**Burnham:** Is he An angry man?
**H. Coffee:** No, he's loving and caring and happy.

Helen Coffee testified that; besides her parents, Luke Coffee is the person who has helped her most

with her struggles and that they talk daily.[37]

**Burnham:** Other than your parents, is there anybody in this world that's helped you more or cared for you or loved you more?
**H. Coffee:** No, sir. He calls me Honey.
**Burnham:** You-all touch base every day, text or something?
**H. Coffee:** Yes, sir.
**Burnham:** So he stays in touch with you daily?
**H. Coffee:** Yes, sir.
**Burnham:** He cares about you that much?
**H. Coffee:** Yes, sir.

**b. Herb Thomas, lifelong friend of Luke Coffee and owner of a Dallas Law Firm**

Herb Thomas, a lifelong friend for 42 years and the owner of Thomas Law Firm, described Luke

Coffee as a peaceful, protective person[38]:

**Thomas:** …I mean, and so this has been a hallmark of his whole life. He's always been the one who has brought out the best in everybody and protected people from other -- from violence. He's -- there has not been a single incident I can think of or hear of when he's been even close to any kind of violence.

---

[36] Transcript of March 8, 2021 Detention Hearing, Page 108 Line 14-21
[37] Transcript of March 8, 2021 Detention Hearing, Page 108 Line 22-25 and Page 109 Lines 1-5
[38] Transcript of March 8, 2021 Detention Hearing, Page 119 Lines 20-24

Herb Thomas testified that Luke Coffee went to Court and testified that he forgave the man who

killed his girlfriend and put Luke Coffee in critical condition after a hit-and-run accident[39]:

> **Thomas:** When the love of his life, his soulmate, Elizabeth Toon and he were walking
> across the street in California and a hit-and-run driver hit them and killed
> Elizabeth and put Luke in the hospital where he almost died. This is the thing
> that would -- should create incredible hatred and revenge and retaliation, but he
> didn't do that. He actually forgave him.

Herb Thomas also stated adamantly that Luke Coffee is not a flight risk or a threat to any person or

the community.[40]

> **Burnham:** And do you believe that Luke Coffee is -- do you think he's a flight risk?
> **Thomas:** No.
> **Burnham:** Okay.
> **Thomas:** He's got too much in Dallas, too many connections here. This is his home.
> You know, his family, his business, he's the CEO of Coffee Productions, he's
> great with films and advertising, commercials, got a great business. He's got
> the responsibility with all his employees and with all his customers.
> **Burnham:** And do you think Luke Coffee is a danger to any person or the community?
> **Thomas:** No. There's no way; not Luke, no.

### c.  Lindsey Collins, lifelong friend of Luke Coffee

Lindsey Collins, owner of her own insurance agency and longtime friend of Luke Coffee,

testified that Luke Coffee is an incredibly loving person[41]:

> **Burnham:** And how did you get to know Luke Coffee? The man seated to my right, right here.
> Is that correct?
> **Collins:** Luke Coffee's like a brother to me.
> **Burnham:** Do what?
> **Collins:** He's like a brother to me. I love him with all my heart…And when my
> daughter's dad passed away, we got really close because he's always there for
> people through tragedy, and that's his gift. He is just our big old teddy bear
> who takes care of us.

Lindsey Collins also stated that Luke Coffee was not a danger to the community or anyone[42]:

> **Burnham:** Okay. And do you think Luke Coffee is a danger to any person or the community?

---

[39] Transcript of March 8, 2021 Detention Hearing, Page 116 Lines 15-23
[40] Transcript of March 8, 2021 Detention Hearing, Page 121 Lines 23-25 and Page 122 Lines 1-3
[41] Transcript of March 8, 2021 Detention Hearing, Page 131 Lines 21-25 and Page 132 Lines 3-6
[42] Transcript of March 8, 2021 Detention Hearing, Page 133 Lines 4-6

**Collins:**    Absolutely not. I would let him babysit my kid today.

### d. Andrew Prine, friend of Luke Coffee for 22 years

Andrew Prine, longtime friend of Luke Coffee, testified that Luke Coffee is a kind-

extremely hearted individual who would most certainly follow the Judge's orders.[43]

> **Burnham:** Okay. And do you stay in touch with Luke Coffee?
> **Prine:**     Yes, I do.
> **Burnham:** And what kind of person is Luke Coffee?
> **Prine:**     He's a very kind-hearted man; one of the nicest people I know, and a very loyal friend.
> **Burnham:** And if His Honor saw fit to put Luke Coffee on pretrial release, do you believe
>                    that he will obey all the Judge's orders?
> **Prine:**     Yes.

When asked if Luke Coffee was a danger to any person or to the community or a

flight risk Andrew Prine testified that Luke was not either[44].

> **Burnham:** Do you think he's a flight risk?
> **Prine:**     No.
> **Burnham:** And do you think he's -- Luke Coffee's a danger to any person or to the community?
> **Prine:**     No, absolutely not.

When asked if Luke Coffee will obey all the Judge's orders for pretrial release, Andre Prine

testified that he would.[45]

> **Burnham:** Okay. And if His Honor saw fit to put Luke Coffee on pretrial release,
> do you believe that he will obey all the Judge's orders?
> **Prine:** Yes.

### e. Travis Barnes, friend of Luke Coffee for 24 years

Travis Barnes, longtime friend of Luke Coffee, testified Luke Coffee could follow

the conditions of probation and was not a danger to anyone.[46]

> **Burnham:** Okay. And just -- and the -- let me ask you a couple of questions here. Do you

---

[43] Transcript of March 8, 2021 Detention Hearing, Page 135 Lines 5-13
[44] Transcript of March 8, 2021 Detention Hearing, Page 135 Line 16-20
[45] Transcript of March 8, 2021 Detention Hearing, Page 135 Line 10-13
[46] Transcript of March 8, 2021 Detention Hearing, Page 141 Line 7-15

think Luke -- if the Judge agrees to give him pretrial release, would you -- do you think Luke could follow -- Luke Coffee could follow the conditions of probation?

**Barnes:** Yes, sir, I believe he'd follow the conditions.

**Burnham:** And do you think he's a danger to any person or anybody in the community?

**Barnes:** No, sir.

### f. Russell Coffee, Jr., father of Luke Coffee

Russell Coffee, Jr., testified that he and his wife would provide Luke Coffee with the appropriate home environment, support, and supervision if he is released pending trial[47]:

**Burnham:** Okay. And if the Judge sees fit to give him pretrial release, where is he going to live, sir?

**R. Coffee:** He's going to live -- we have a guest cabin right next to our main cabin, our house at Cedar Creek Lake one hour from Dallas. We're there most of the time, and we will be watching over him and morally supporting him and helping him until his trial or whatever happens.

**Burnham:** And the -- do you-all -- the home at 1113 Rim of the World, Tool, Texas, is that your address?

**R. Coffee:** Yes, sir, that's it.

**Burnham:** And if the Judge decides to give your son pretrial release, do you think he would follow the orders of the Court?

**R. Coffee:** He will definitely follow it, and I'll make sure he follows it. And I'll take him by car, by bus, by plane, I will take him and I swear on the Good Lord Jesus Christ I'll be there with him.

**Burnham:** You're going to be there with him, so you don't think he's a flight risk?

**R. Coffee:** Absolutely not a flight risk.

### f. Nature and Seriousness of the Danger to the Community

The fourth factor to consider, the nature and seriousness of the danger to any person or the community that would be posed by the person's release, is clearly in favor of release from detention. The nature and seriousness of the danger that Luke Coffee poses to the community must be proven by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of any other person and the community. The Bail Reform Act permits the detention of Luke Coffee only to prevent an identified and articulable future threat to an individual or the

---

[47] Transcript of March 8, 2021 Detention Hearing, Page 143 Lines 1-10 and Lines 15-23

community. Luke Coffee must be given the benefit of the doubt that there is no plausible explanation for why the Magistrate's stringent conditions would not reasonably ensure public safety. 18 U.S.C. § 3142(g)(1)– (4).

There is no danger to the community if Luke Coffee is released under the pre-trial conditions ordered by the Magistrate. Luke Coffee will be supervised by his father, Russell Coffee, Jr., as a third-party custodian. He will be subject to electronic GPS monitoring. He does not own or possess a firearm.

The Government cannot justify detention of Luke Coffee on the basis of dangerousness because the Government has not proven by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of any other person and the community. Thus, Luke Coffee's history, characteristics, and alleged criminal conduct makes it clear that he does not pose a concrete, prospective threat to public safety.

The Magistrate Judge imposed strict release conditions. The Government given no plausible explanation for why these stringent conditions would not reasonably ensure public safety.  The record strongly suggests that Luke Coffee would present no safety risk if subjected to strict release conditions. The Government has not proved its case by clear and convincing evidence.

## Conclusion

At the detention hearing on March 8, 2021 six witnesses testified to Luke Coffee's character stating that he was not a flight risk and was not a danger to the community and Jim Burnham proffered an additional nine witnesses who all testified to the same thing. Luke Coffee has many family ties to the Dallas Metroplex area including his 3 siblings and his mother and father all of whom he keeps in regular contact with. Coffee has had his own business in Dallas for 13 years and has been an upstanding member of the community. According to the Pretrial Services report by Stuart Siegel, "Pretrial Services respectfully recommends the defendant be released on a Personal

Recognizance bond…"[48] Special Agent Hillman testified that Luke Coffee is so far not a flight risk[49]:

> **Burnham:** And then I called you the next day the 25th (February) and I said, you don't think you're not trying to say Luke Coffee's a flight risk, and you say, So far no. Remember saying that to me?
> **Hillman:** Yes, sir.

In addition to the witnesses' testimonies, Coffee has no criminal record as Magistrate Judge David Horan acknowledged, "As to danger to another person or the community prior to January 6, 2021, the evidence shows Mr. Coffee has no criminal history or any apparent evidence of violence in his life at all up to that point."[50] Besides having no criminal background, there is no evidence that Luke Coffee was responsible for anyone being injured.

Luke Coffee is not member of Proud Boys, VSC-131, the Three Percenters, or other organizations whose efforts indicated a coordinated and premeditated plan of action. Luke Coffee attended what he believed to be a peaceful rally held in support of President Donald Trump and had no intention of participating in an insurrection.

After reviewing all the facts presented at the detention hearing on March 8, 2021, Magistrate Judge David Horan denied the Government's motion for detention, ruling (1) that the Government failed to prove Luke Coffee was a flight risk by even a preponderance of the evidence[51], and (2) that the Government failed to prove Luke Coffee was a threat to the community by clear and convincing evidence.[52] The court ordered Luke Coffee released on certain conditions, including third-party custodianship by his father, supervision by pre-trial services, and electronic monitoring.

---

[48] Pretrial Services Report of March 5, 2021, Page 5
[49] Transcript of March 8, 2021 Detention Hearing, Page 73-74 Lines 24-25 and Lines 1-3
[50] Transcript of March 8, 2021 Detention Hearing, Page 168 Lines 13-16
[51] Transcript of March 8, 2021 Detention Hearing, Page 168-170.

[52] Transcript of March 8, 2021 Detention Hearing, Page 169.

Such conditions as those ordered by the Magistrate Judge are more than sufficient to reasonably assure Luke Coffee's future appearances before this Court and the safety of all persons and the community under the heightened standards of the Bail Reform Act.

Counsel understands that Luke Coffee is currently detained in the Limestone County Detention Center, Limestone, Texas where he has been detained since his arrest on February 25, 2021. Given that the Limestone County Detention Center appears to have video conference capability, Luke Coffee respectfully requests a detention hearing by video conference from Texas.

Respectfully submitted,

**/s/ *Jim Burnham***

Jim Burnham

State Bar No. 0344100
6116 N. Central Expwy., Ste. 515
Dallas, Texas 75206
Telephone (214) 750-6616
Facsimile (214) 750-6649
Email:
Jim@Jburnhamlaw.com

## CERTIFICATE OF SERVICE

I, Jim Burnham, hereby certify that on March 31, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Peter Lallas
Assistant United States Attorney
N.Y. Bar Number 4290623
United States Attorney's Office
555 Fourth Street, N.W.
Washington, D.C. 20530
Telephone: (202) 252-6879
Email: peter.lallas@usdoj.gov

/s/ Jim Burnham
**JIM BURNHAM**